# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| DAVID SCOTT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 5:23-cv-01041-HNJ |
| | ) | |
| BILL NELSON, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This civil action proceeds before the court on Defendant Bill Nelson's[1] Motion for Judgment on the Administrative Record, (doc. 38), and Motion for Summary Judgment, (doc. 39). The court also considers Plaintiff David Scott's Motion to Expand the Administrative Record, (doc. 48).

As illustrated herein, the court **DENIES** Scott's Motion to Expand the Administrative Record, as Scott has not met the required showing of agency bad faith to allow the court to consider additional evidence.

Furthermore, the court **GRANTS** Nelson's Motion for Summary Judgment because Scott has abandoned his claims of age and disability discrimination on summary judgment. The court also finds the Merit Systems Protection Board (MSPB) decision does not represent an abuse of discretion. Accordingly, the court **GRANTS** Nelson's

---

[1] The court will refer to Defendant Nelson as the "Agency" or "NASA" (the National Aeronautics Space Administration).

Motion for Judgment on the Administrative Record.

## STANDARDS OF REVIEW

"A federal employee subjected to an adverse personnel action such as a discharge or demotion may appeal [his] agency's decision to the Merit Systems Protection Board (MSPB or Board)." *Kloeckner v. Solis*, 568 U.S. 41, 43 (2012) (citing 5 U.S.C. §§ 7512, 7701). "Such an appeal may merely allege that the agency had insufficient cause for taking the action under the [Civil Service Reform Act]; but the appeal may also or instead charge the agency with discrimination prohibited by another federal statute . . . ." *Id.* at 44 (citing 5 U.S.C. § 7702(a)(1)). "In . . . 'mixed' cases where discrimination claims as well as claims not based on discrimination were both presented before the Board . . . the district court has jurisdiction to review both the discrimination and non-discrimination claims." *Kelliher v. Veneman*, 313 F.3d 1270, 1274 (11th Cir. 2002) (citing *Doyal v. Marsh*, 777 F.2d 1526, 1536 (11th Cir. 1985)).

In a mixed case, the standard of review differs for the discrimination claims and the non-discrimination claims. *See id.* "[T]he court reviews discrimination claims *de novo* and nondiscrimination claims based on an arbitrary and capricious standard." *Murphy v. McCarthy*, No. 5:14-cv-02489-RDP, 2017 WL 6492607, at *2 (N.D. Ala. Dec. 19, 2017) (citing 5 U.S.C. § 7703(c)), *aff'd sub nom. Murphy v. Sec'y, U.S. Dep't of Army*, 769 F. App'x 779 (11th Cir. 2019); *see also Kelliher*, 313 F.3d at 1275 ("Courts that have addressed the issue uniformly apply the de novo standard of review only to the discrimination claims while other claims adjudicated before the MSPB are reviewed on

the record." (citations omitted)).

## A.    The Arbitrary and Capricious Standard Review

"MSPB determinations are reviewed on the record and set aside only if the 'agency action, finding[,] or conclusion' is found to be: '(1) arbitrary, capricious, and an abuse of discretion or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence.'" *Kelliher*, 313 F.3d at 1275 (citing 5 U.S.C. § 7703(c)).  The arbitrary-and-capricious standard of review "give[s] [a] court the least latitude in finding grounds for reversal." *Cash v. CIA*, No. 3:22-CV-81, 2025 WL 952213, at *7 (M.D. Ga. Mar. 28, 2025) (quoting *Baker v. Sec'y, U.S. Dep't of Transp.*, 452 F. App'x 934, 937 (11th Cir. 2012), *reconsideration denied,* No. 3:21-CV-81 (CAR), 2025 WL 2099987 (M.D. Ga. July 25, 2025)).  It "allows a court on appeal to only 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment.'" *Harris v. Dep't of Veterans Affs.*, No. 2:22-cv-828-CLM, 2024 WL 4031357, at *3 (N.D. Ala. Sept. 3, 2024) (quoting *Kelliher*, 313 F.3d at 1276); *see also Kelliher*, 313 F.3d at 1277 ("This deferential standard of review means that as long as the conclusion is reasonable, we defer to the agency's findings of fact even if we could have justifiably found differently. . . .  We do not re-weigh or re-examine the credibility choices made by the fact finder." (citations omitted)).  "The plaintiff bears the burden of showing that the MSPB committed [a] reversible error." *Powell v. Nat'l Lab. Rels. Bd.*, No. 2:16-cv-01492-KOB, 2019 WL 157743, at *1 (N.D.

Ala. Jan. 10, 2019) (citing *Harris v. Dep't of Veterans Affs.*, 142 F.3d 1463, 1467 (Fed. Cir. 1998)).

## B.    The Summary Judgment Standard

The reviewing court subjects discrimination claims in a mixed case to trial *de novo*. *See Kelliher*, 313 F.3d at 1274 (citing 5 U.S.C. § 7703(c)).  Therefore, on a motion for summary judgment "the court applies its typical summary judgment standard" vis-à-vis such claims.  *Harris*, 2024 WL 4031357, at *3; *see also Cash*, 2025 WL 952213, at *9-10.

Pursuant to the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The

> party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

If the movant sustains its burden, the non-moving party demonstrates a genuine issue of material fact by producing evidence by which a reasonable fact-finder could return a verdict in its favor.  *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (citation omitted).  The non-movant sustains this burden by demonstrating "the record in fact contains supporting evidence, sufficient to withstand

4

a directed verdict motion." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993). In the alternative, the non-movant may "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116-17; *see also Doe v. Drummond Co.*, 782 F.3d 576, 603-04 (11th Cir. 2015).

The "court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151 (citation omitted). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* (citation omitted).

Federal Rule of Civil Procedure 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S.

at 322.  "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 322-23.  In addition, a movant may prevail on summary judgment by submitting evidence "*negating* [an] opponent's claim," namely, by producing materials disproving an essential element of a non-movant's claim or defense.  *Id.* at 323 (emphasis in original).

There exists no issue for trial unless the nonmoving party submits evidence sufficient to merit a jury verdict in its favor; "[i]f the evidence is merely colorable or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).  In other words, the movant merits summary judgment if the governing law on the claims or defenses commands one reasonable conclusion, but the court should deny summary judgment if reasonable jurors could "differ as to the import of the evidence."  *Id.* at 250.

## THE COURT DENIES SCOTT'S MOTION
## TO EXPAND THE ADMINISTRATIVE RECORD

As previously revealed, Scott moves to expand—or supplement[2]—the administrative record with evidence the MSPB did not consider.  (Doc. 48).  In support of this motion, he asserts "Exhibit A [Doc. 44-1] identifies information that did not

---

[2] "[S]upplementation of the record deals with 'materials which were not considered by the agency, but which are necessary for the court to conduct a substantial inquiry.'"  *Motivation, Inc. v. Ross*, No. 20-10140-CIV-MARTINEZ/SANCHEZ, 2024 WL 5433115, at *2 (S.D. Fla. Sept. 27, 2024) (citations omitted).

reach [him] until November 23, 2023," after the MSPB record closed. (Doc. 49 at 2). He also argues the additional exhibits and affidavits he tenders constitute "evidence of a strong showing of bad faith and improper behavior by the agency, and thus justify supplementing the administrative record." (Doc. 48 at 3). Finally, he contends he "suggested to prior counsel that [they] call [George] Hamilton or [Judith] Gregory" during the MSPB hearing—the two individuals whose affidavits he now requests the court to consider—but "prior counsel was pretty much in the driver's seat at the time of the hearing" and decided against calling these witnesses to testify. (Doc. 49 at 3; doc. 37-31 at 279:12-16).

Generally, when reviewing an administrative agency's action, a court should focus on the administrative record. *Pres. Endangered Areas of Cobb's Hist., Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir. 1996) [hereinafter *PEACH*] (citing *Camp v. Pitts*, 411 U.S. 138, 142 (1973)); *see also Nat'l Min. Ass'n v. Sec'y, U.S. Dep't of Lab.*, 812 F.3d 843, 875 (11th Cir. 2016) ("[T]he general rule, applicable across the board to judicial review of administrative action[,] . . . is that the court may not go outside the administrative record." (first alteration in original) (quoting *Najjar v. Ashcroft*, 257 F.3d 1262, 1278 (11th Cir. 2001), *overruled on other grounds by Patel v. U.S. Att'y Gen.*, 971 F.3d 1258 (11th Cir. 2020))). "The role of the court is not to conduct its own investigation and substitute its own judgment for the administrative agency's decision." *PEACH*, 87 F.3d at 1246 (citing *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) [hereinafter *Overton Park*], *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99

(1977)). "The factfinding capacity of the district court is thus typically unnecessary . . . . [The court is] to decide, on the basis of the record the agency provides, whether the action passes muster under the appropriate [Administrative Procedure Act (APA)] standard of review." *Id.* (citing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)).

Scott centers his bad-faith entreaty on the emergence of alleged new evidence the court should consider despite the fact he did not present it during the MSPB process. In particular, he highlights evidence regarding communications between Human Resources (HR) personnel and Scott's former supervisor, Christopher Rosson. The evidence purportedly depicts that HR suggested Rosson should subject Scott to a disciplinary action rather than a Performance Improvement Plan (PIP) regarding certain performance issues. Scott asserts the recommendation regarding disciplinary action "was not known to [him] until late 2023, after the MSPB record closed." (Doc. 48 at 2).[3]

---

[3] To the extent Scott argues the court should assess this information on review of the administrative record because it constitutes newly discovered evidence, "[t]he question of whether to consider allegedly material evidence discovered after the close of the administrative record must be reserved for initial consideration by the MSPB in the context of a petition requesting that the MSPB reopen the file for additional review in light of the newly discovered evidence." *Sher v. U.S. Dep't of Veterans Affs.*, No. Civ. 04-182-B-W, 2005 WL 2515837, at *1 (D. Me. Aug. 4, 2005), *aff'd,* No. Civ. 04-182-B-W, 2006 WL 473745 (D. Me. Feb. 27, 2006), *aff'd,* 488 F.3d 489 (1st Cir. 2007); *see also Guirguess v. U.S. Postal Serv.*, 32 F. App'x 555, 560 (Fed. Cir. 2002) ("Therefore, because that evidence was neither before the [Administrative Judge] (AJ) when he made his determination nor before the full Board on Guirguess's petition for review, it may not be considered on appeal."); 5 C.F.R. § 1201.115(d)(1) (authorizing the MSPB to grant a petition for review upon a showing "[n]ew and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. To constitute new evidence, the information contained in the documents, not just the documents themselves, must have been unavailable despite due diligence when the record closed."); *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing

Although "a court conducting a judicial review is not 'generally empowered'" to go beyond the administrative record, "certain circumstances may justify" doing so. *PEACH*, 87 F.3d at 1246; *see also id.* at 1246 n.1 ("The Ninth Circuit has specified that a court may go beyond the administrative record only where: 1) an agency's failure to

---

court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. The reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.").

In the case at bar, Scott's contentions do not warrant remand to the MSPB. First, it appears unlikely Scott can demonstrate this information represents evidence unavailable to him at the time of the MSPB hearing despite due diligence. He currently advances two affidavits to support his contention HR advised Rosson to levy a disciplinary action against him, one from Hamilton and the other from Gregory. (*See* doc. 44-7 at ¶ 8; doc. 44-8 at ¶ 4). As an initial matter, Scott does not allege NASA's bad faith or improper behavior prevented him from obtaining evidence from these witnesses. (*See* doc. 51 at 3).

More importantly, Scott listed both Hamilton and Gregory as proposed witnesses for the MSPB hearing, (doc. 37-19 at 3-4), the AJ approved them to testify, (doc. 37-30 at 4-5), and yet, Scott's representative at the hearing chose not to call either witness, (doc. 37-31 at 278:9-11; 279:12-16). Therefore, Hamilton and Gregory could have presented their information about HR's advice at the MSPB hearing. To be sure, Scott blames his former counsel for not calling Hamilton and Gregory to testify during the MSPB hearing. (Doc. 51 at 3). Nevertheless, regrets about strategic decisions do not reflect an impediment to Scott obtaining this evidence during the hearing with appropriate due diligence. *C.f.*, *Guirguess*, 32 F. App'x at 561 (holding proposed "new" evidence did not justify a remand because plaintiff's counsel cross-examined the affiant at length before the AJ).

Furthermore, the MSPB countenances purportedly new evidence when it bears a material effect upon a prior disposition, that is, when "the evidence is of sufficient weight to warrant an outcome different from that of the initial decision." *Cleaton v. Dep't of Just.*, 122 M.S.P.R. 296, 299 (2015), *aff'd,* 839 F.3d 1126 (Fed. Cir. 2016). In the MSPB proceedings, Scott's submissions included evidence of HR's purported advice to not place Scott on a PIP. (Doc. 37-38 at 12-13). The additional purported HR advice to subject to Scott to a disciplinary action rather than a PIP would not bear any material effect upon the prior determination, especially as Rosson did not follow any of the suggestions at the time HR rendered its advice. (*See* doc. 37-31 at 114:14-24 (hearing testimony in which Rosson testifies he assigned Scott to a new role, Ground Data Systems Engineer, to provide him an "additional opportunity to correct his performance challenges"); doc. 37-33 at 5 ("Rosson did not immediately place the appellant on a PIP after his unsuccessful 2018 annual performance evaluation. Instead, on May 16, 2019, he updated the appellant's Performance Plan to clarify his expected performance over the upcoming year. Specifically, Rosson . . . created a new critical element entitled 'Ground Data Systems Engineer.'")).

9

explain its action effectively frustrates judicial review; 2) it appears that the agency relied on materials not included in the record; 3) technical terms or complex subjects need to be explained; or 4) there is a strong showing of agency bad faith or improper behavior." (citing *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1436-37 (9th Cir. 1988), *amended,* 867 F.2d 1244 (9th Cir. 1989))).  While the Eleventh Circuit has "acknowledged that various factors could be considered in determining the propriety of reviewing extra-record material on review" of an agency action, "in practice, . . . [it] generally ha[s] focused pointedly on whether the petitioners have made a 'strong showing of bad faith or improper behavior by the agency.'"  *Nat'l Min. Ass'n*, 812 F.3d at 875 (quoting *Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1262 (11th Cir. 2007)); *see also Marllantas, Inc. v. Rodriguez*, 806 F. App'x 864, 867 (11th Cir. 2020) ("The district court may order discovery beyond the administrative record *only* where there is 'a strong showing of bad faith or improper behavior' by the agency." (emphasis added) (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019))).

Scott, as the party seeking to supplement the record, bears "a heavy burden to show that supplementation is necessary."  *United States v. Amtreco, Inc.*, 806 F. Supp. 1004, 1006 (M.D. Ga. 1992) (citing *Overton Park*, 401 U.S. at 415); *see also Altamaha Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, No. CV 206-186, 2007 WL 1830864, at *2 (S.D. Ga. June 21, 2007) ("[E]xceptions [allowing supplementation of the record] must be narrowly construed, and a party seeking to supplement the administrative record must meet 'a heavy burden to show that supplementation is necessary.'"  (quoting

10

*Kirkpatrick v. White*, 351 F. Supp. 2d 1261, 1272 (N.D. Ala. 2004))).  Scott has not carried this burden.[4]

First and foremost, HR's advice to Rosson regarding the propriety of two avenues of discipline, even if one approach (disciplinary action) occasions less severe discipline than another (PIP), does not evince any bad faith conduct by the Agency, particularly vis-à-vis any withholding of evidence.  Indeed, part of the advice already existed in the administrative record.  (*See* doc. 37-38 at 12-13 (revealing Scott's appellate reply brief in the MSPB proceedings recounts HR advised Rosson, "Don't put Scotty on a PIP because he'll do well")).  In addition, Rosson did not follow any of the suggestions at the time HR rendered its advice.  (*See* doc. 37-31 at 114:14-24 (hearing testimony in which Rosson testifies he assigned Scott to a new role, Ground Data Systems Engineer, to provide him an "additional opportunity to correct his performance challenges"); doc. 37-33 at 5 ("Rosson did not immediately place the appellant on a PIP after his unsuccessful 2018 annual performance evaluation. Instead, on May 16, 2019, he updated the appellant's Performance Plan to clarify his expected performance over the upcoming year. Specifically, . . . he created a new critical element entitled 'Ground Data Systems Engineer.'")).  Based upon the foregoing circumstances,

---

[4] Many of the documents Scott seeks to introduce duplicate, in whole or in part with Scott's added commentary, materials already contained within the administrative record submitted by Nelson in support of his Motions for Summary Judgment and Judgment on the Administrative Record.  (*See* doc. 38 at 1-2 ("There are portions of these exhibits that discuss or refer to matters contained in the administrative record, and the Court certainly has the discretion to consider those portions.")).  Thus, the court will focus its discussion on the portions of the documents absent from the administrative record, that is, those that would constitute supplementation of the record.

Scott has not sustained his burden of demonstrating bad faith by the Agency in this regard. *See Snyder Computer Sys., Inc. v. U.S. Dep't of Transp.*, 13 F. Supp. 3d 848, 864 (S.D. Ohio 2014) (holding National Highway Traffic Safety Administration engineer's statement, "we have to make sure they don't pass," insufficient to depict a strong showing of bad faith when the administrative record contained no evidence the engineer "could have somehow 'rigged' these extensive and repeated tests so that [the company's vehicle] would fail"); *Charter Twp. of Van Buren v. Adamkus*, 188 F.3d 506, at *5 (6th Cir. 1999) ("Bremer's statements that 'the money issue carries most weight' and that Ford, one of the companies that would use the site, 'had a history of waiting to the last minute and trying to save a buck,' by themselves simply fall short of this requirement. Such 'bald assertions of bad faith are insufficient to require agency officials to submit to depositions.'" (quoting *Friends of the Shawangunks, Inc. v. Watt*, 97 F.R.D. 663, 667-68 (N.D.N.Y. 1983))).

In addition, Scott fashions his bad faith argument on "numerous procedural errors and questionable ethical actions" on the agency's part, (doc. 49 at 4)—especially those related to "[t]he April 2019 request for a 'no-fault' transfer to another work area per union contract process (including HR's untimely, inappropriate response)," (doc. 48 at 2)—as well as "actions, omissions, and outright violations from May 2018 – May 2020," (doc. 51 at 3).[5] Those matters constitute merits issues more properly addressed

---

[5] The other procedural errors Scott attributes to various agency officials comprise the following contentions:  no agency official addressed the issues Scott raised in a document he titled "Heart of the

in review of the Motion for Judgment on the Administrative Record. *See Comprehensive Cmty. Dev. Corp. v. Sebelius*, 890 F. Supp. 2d 305, 315 (S.D.N.Y. 2012) ("Soundview's arguments as to bad faith consist of merits arguments as to why [Health Resources and Services Administration], purportedly, misapplied various review criteria, or misinterpreted information in the competing grant applications. . . . However, to establish bad faith requires a strong showing; this showing is not made out by the mere fact that a court may disagree with the agency on the merits or find error, procedural or substantive, by the agency decision-maker." (citing *Sierra Club v. U.S. Army Corps of Eng'rs*, 701 F.2d 1011, 1044 (2d Cir. 1983))); *see also Ali v. Pompeo*, No. 16-CV-3691-KAM-SJB, 2018 WL 2058152, at *6 (E.D.N.Y. May 2, 2018) ("Or put differently, by arguing that the agency acted improperly, Ali is arguing about the merits of his APA claim." (citing *Comprehensive Cmty. Dev. Corp.*, 890 F. Supp. 2d at 315)); *Tindal v. McHugh*,

_____

Matter?" despite numerous opportunities to do so, (doc. 44 at 4); HR did not timely respond to his request for a "no-fault" transfer under Collective Bargaining Agreement (CBA) 20.04, (doc. 44-4 at 3); HR only investigated his request for reassignment by sending Scott and Rosson four questions from a sexual harassment questionnaire, (*id.*); Rosson did not take immediate corrective action after Scott received an unacceptable rating on his 2018-2019 performance review, (doc. 49 at 3); the rating official, not the approving official, improperly addressed his informal request for reconsideration of his unacceptable rating, (doc. 44-4 at 5); the rating official's response did not provided written reasons for not changing the rating, (*id.* at 6); the agency did not undertake "positive, constructive efforts to resolve the matter" as encouraged under the CBA, (*id.*); the agency improperly designated the approving official as the deciding official for his formal grievance of the unacceptable rating, (*id.* at 6-7); the deciding official did not timely forward names of potential examiners for his grievance, (*id.* at 7); the deciding official did not afford Scott an opportunity to speak with him about the formal grievance, (*id.*); the agency changed the deciding official mid-grievance, (doc. 44-5 at 1); the grievance examiner did not provide Scott and his representative a copy of the grievance file for comment before forwarding it to the deciding official, (*id.*); the grievance examiner's report did not include HR's advice to not place Scott on a PIP, (*id.* at 2); Rosson improperly designed the PIP, (doc. 49 at 6); and, the agency refused Scott's requests for certain information, including emails, to contest his proposed removal, (doc. 44-10 at 5-11).

945 F. Supp. 2d 111, 125 (D.D.C. 2013) ("[T]he plaintiff does not challenge the procedural validity of the Board's decision.  Rather, the gravamen of the plaintiff's claim is that the Board's decision was irrational and that its factual findings were not supported by substantial evidence . . . .  Thus, the substantive nature of the plaintiff's complaint about the Board's decision militates strongly against the consideration of extra-record evidence. . . .  Moreover, . . . the Court is concerned that considering such evidence would be highly prejudicial to the Board because the plaintiff conceded that this evidence was available well before the 2010 Board decision at issue in this case."); *Doe v. U.S. Immigr. & Customs Enf't*, No. 1:23-cv-00971-MLG-JMR, 2025 WL 824067, at *5 (D.N.M. Mar. 14, 2025) ("Plaintiffs have not shown that Burke, Wong, the acting [Deputy Assistant Director/Oversight, Compliance, and Acquisition Division], or any other federal Defendant acted in bad faith by withholding records from Nakamoto [(a contracted compliance review group)], destroying relevant documents, or otherwise altering the administrative record at the decision-making stage.  To the extent Plaintiffs contend that Defendants did not comply with the [Detention Management Control Program (DCMP)], either by certifying Torrance [County Detention Center] without a full inspection file or by failing to demand Nakamoto's strict compliance with DMCP guidelines, those arguments go to the merits of Plaintiffs' claims."); *c.f.*, *Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 305 F.R.D. 256, 292 (D.N.M. 2015) ("When an appellant appeals an agency's decision and argues that the normal appellate procedure should not be followed because the agency acted in bad faith, the appellant

14

should not be able to use the patent wrongness of the agency's substantive decision as proof of the agency's bad faith.  This approach would short-circuit the appellate process, effectively allowing the appellant to argue the merits of the appeal outside of the normal procedural rules. . . .  [T]he Court would, effectively, be granting the Plaintiffs an unlimited-record merits appeal merely because they alleged bad faith.  The Court concludes that this result would undermine the appellate posture and procedural deference regimes that administrative law creates.  Moreover, if the agency's substantive decision is so wrong as to constitute evidence of bad faith, then the appellant will likely prevail on the merits—where such arguments should be made and heard, and where the administrative-record rule applies."), *adhered to on reconsideration,* No. CIV. 12-0069 JB/KBM, 2015 WL 5138286 (D.N.M. Aug. 26, 2015).

Finally, Scott contends the court should review the alleged omissions and irregularities because any failure to present such evidence during the administrative proceeding resulted from the litigation decisions of his prior counsel.  (Doc. 49 at 3).  The failure of Scott's prior counsel to present particular evidence during the administrative proceedings does not depict the "bad faith or improper behavior by the agency" required by the Eleventh Circuit for consideration of supplemental evidence on an administrative review.  *Marllantas*, 806 F. App'x at 867; *see also Nat'l Min. Ass'n*, 812 F.3d at 875 n.32 ("[T]here is simply no persuasive justification for allowing the petitioners to rest *now* on a decades-old study, available to them during notice-and-comment, on which they failed to rely."); *Rust Constructors Inc. v. United States*, 49 Fed.

15

Cl. 490, 497 (2001) ("In the instant matter, the court finds that the inclusion of these affidavits would be prejudicial to defendant's case.  Plaintiff failed to provide these affidavits to the agency level review board during its administrative appeal.  It would now be unfair for plaintiff to raise these declarations for the first time without cause."); *Murakami v. United States*, 46 Fed. Cl. 731, 736 (2000) ("[W]here judicial review is based on an administrative record, this court generally will reject extra-record evidence that was available, but not presented to the agency below."); *Havasupai Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir. 1991) ("[T]he Tribe relies upon the contentions of Dr. David Kramer, which were made in a letter drafted after the final [Environmental Impact Statement] issued.  The Tribe had some obligation to raise these issues during the comment process.  Its views were solicited.  Absent exceptional circumstances, such belatedly raised issues may not form a basis for reversal of an agency decision."); *United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 35 (1952) ("Appellee did not offer . . . any excuse for its failure to raise the objection upon at least one of its many opportunities during the administrative proceeding.  Appellee does not claim to have been misled or in any way hampered in ascertaining the facts about the examiner's appointment.  It did not bestir itself to learn the facts until long after the administrative proceeding was closed and months after the case was at issue in the District Court . . . .  [O]rderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts.").

Therefore, the court declines to consider the supplemental evidence Scott submitted as attachments to his Consolidated Response to Motion for Judgment on the Administrative Record and Motion for Summary Judgment, (docs. 44-1 to -10).

## BACKGROUND

Plaintiff Scott commenced his career at NASA in 1989 as a member of Missions Operations at the Geroge C. Marshall Space Flight Center (MSFC) in Huntsville. (Doc. 37-8 at 105-06; doc. 37-31 at 10:15-23). At the time of his removal from federal service on May 29, 2020, (doc. 37-9 at 158), Scott worked as a non-supervisory GS-0854-13 Computer Engineer, AST, Aerospace Information Technology in the Mission Systems Engineering and Operations Integration Branch, a position he held for at least seven years prior to his removal. (Doc. 37-8 at 94; doc. 37-31 at 8:18-9:7, 98:16-24; doc. 30 at ¶ 11). Scott's role entailed working with the Huntsville Operations Support Center (HOSC), which supports various NASA projects inclusive of the International Space Station (ISS) and the Space Launch System (SLS). (Doc. 37-31 at 10:25-11:25).

In April 2018, Christopher Rosson assumed the Supervisory Branch Chief position in Scott's unit, which maintained responsibility for "the facility, the infrastructure, the hardware infrastructure, and software infrastructure that[ is] used to create communications" between the HOSC, MSFC's ground station, and space craft in space, such as the ISS. (*Id.* at 99:4-10, 98:16-18, 101:16-18). In this role, Rosson served as Scott's direct supervisor, and Rosson reported to Joesph Pelfrey, who served as both the deputy manager of the Human Exploration Development and Operations

office and, on a special assignment, as the executive manager of the Payload and Mission Operations Division.  (*Id.* at 101:16-18, 241:4-16).

In May 2018, Scott and Rosson discussed Scott's Employee Performance Plan for the 2018-2019 performance period.  (*Id.* at 13:13-23, 102:24-103:16).  As a result of these discussions, Rosson issued Scott a performance plan with three critical elements: 1) Safety, Diversity, and Inclusion; 2) Customer Service Focus, Innovation, Collaboration, and Teamwork; and 3) HP27 Training Lead/Payload Operations Integration Function (POIF) Coordinator.  (Doc. 37-8 at 74-81; doc. 37-9 at 102).  Scott and Rosson both signed this plan on May 23, 2018.  (Doc. 37-8 at 74).

In August 2018, Rosson assigned Scott two tasks: development of 1) "a presentation/guide for the HOSC on it's [sic] services and how things work that could be used for multiple customers (both technical and not)"; and 2) a set of discipline guides to "hand to brand new people out of college . . . for all the Contract Discipline areas (Software Engineering, Systems Engineering, Operations & Maintenance, Networks/IT Security, Customer Service Team, IV&V, etc.)."  (Doc. 37-28 at 49; doc. 37-31 at 14:4-15, 106:2-20).  Rosson stipulated a deadline of December 31, 2018, for Scott to complete the HOSC presentation/guide and bring the second task, the discipline guides, to approximately 50% completion.  (Doc. 37-28 at 49; doc. 37-31 at 14:16-15:1, 106:21-107:2).  Scott alleges a stressful work environment under Rosson commenced around this time.  (Doc. 30 at ¶ 13).

Throughout the fall of 2018, Rosson provided Scott frequent updates regarding

18

Rosson's concerns with Scott's work product. (*See*, *e.g.*, doc. 37-31 at 15:6-16:22, 107:7-21). In October 2018, Scott established a timeline of expected completion dates for a series of intermediate milestones to ensure completion of both tasks by the end of December 2018. (Doc. 37-28 at 50, 51) ("Based on our last few discussions . . . I'm concerned that you're not on schedule to be able to meet the previously discussed deadlines which seemed extremely generous. In light of that concern, I'd like for you to set some interim milestones and target dates to help ensure successful completion of the assignment.").

In November 2018, Rosson issued a written Midpoint Review of Scott's progress on his Performance Plan. (Doc. 37-8 at 93). In this review, Rosson noted concerns with Scott's work, especially his performance on the third critical element: Training and POIF Coordinator. (*See id.* ("Dave's performance has not consistently met expectations throughout the performance period. He has also not consistently provided timely and value-added support to the branch and its stakeholders. The potential need for a Performance Improvement Plan was highlighted during the review.")). Scott, however, asserts Rosson's gave more mixed verbal feedback during the midpoint review meeting. (Doc. 30 at ¶ 15 ("In the mid-term performance assessment interview, the branch chief and deputy branch chief provided a mix of very positive feedback, e.g., 'We love your creativity and the way you think[,'] and 'concerns[,'] including suggestion of a potential PIP. The written narrative was entirely negative, not providing a balanced view of what was said.")).

In any event, Scott did not complete the assigned tasks by the December 31, 2018, due date. (Doc. 37-31 at 16:24-17:7, 107:3-6). After the occurrence of a government shutdown resulting in Scott's furlough, a month to settle back into the office, and an extension to complete the assigned tasks, Rosson emailed Scott on April 4, 2019, to set a new final deadline for the first task on April 18 and the second task on April 25. (Doc. 37-31 at 17:8-18:22, 109:22-111:1; doc. 37-28 at 67). Scott did not submit completed work products for either task on these new due dates, and further, Scott did not complete either of the tasks during his time at NASA. (Doc. 37-31 at 18:23-19:5, 111:2-12). Consequently, Rosson rated Scott "Level 1: Fails to Meet Expectations," on Critical Element 3 of Scott's Performance Plan, resulting in Scott's Summary Rating of "Level 1: Unacceptable" for the 2018-2019 performance period. (Doc. 37-8 at 74, 80, 83; doc. 37-31 at 19:6-24, 111:22-112:6).[6]

Scott then emailed Pelfrey to file an informal request for reconsideration of his unacceptable performance rating on July 2, 2019. (Doc. 37-28 at 14). After receiving

---

[6] Scott asserts "the President and Vice President of the labor union representing [Scott]'s bargaining unit met with MSFC Human Resources (HR) regarding the branch chief's plans with respect to [Scott]" in early April 2019. (Doc. 30 at ¶ 16). Scott also attests that in that same time frame he "presented an informal paper titled 'Heart of the Matter?' explaining many of the inconsistencies, mixed signals, and i[]mplied threats to union officials, who provided a copy to HR, who in turn provided a copy to the branch chief." (Id. at ¶ 17). Scott contends agency officials never addressed the issues raised in this document. (Id.). Finally, Scott asserts he requested a "no fault" transfer in late April 2019. (Id. at ¶ 18). He argues "HR failed to respond in a timely manner, and when finally providing inputs for an investigation approximately four month[s] later, suggested interviewing each party based on a sexual harassment questionnaire." (Id.). Other than arguments lodged by Scott's representative during the administrative proceedings, the administrative record contains no evidentiary basis for these contentions. (See doc. 37-9 at 165-66, 169; doc. 37-38 at 13 n.4).

a response from Rosson declining to change the rating, Scott filed a formal grievance on July 30, 2019. (*Id.* at 11; doc. 37-31 at 22:9-16, 113:11-14). A grievance examiner investigated and declined to recommend any changes to Scott's performance rating. (Doc. 37-28 at 120-22).

While Scott proceeded with the grievance challenging his rating, Rosson issued him a new Performance Plan for the 2019-2020 rating period in May 2019. (Doc. 37-8 at 40; *see also* doc. 37-9 at 103). Rather than placing Scott on a Performance Improvement Plan (PIP), Rosson decided "to reassign him internally within [the] organization to a new role to give him [an] additional opportunity to correct his performance challenges." (Doc. 37-31 at 114:14-19; *see also* doc. 37-9 at 103). In Scott's new plan, Rosson removed the critical element of Training Lead and POIF Coordinator and added a critical element of "Ground Data Systems Engineer." (*See* doc. 37-8 at 44-45; *see also* doc. 37-31 at 114:22-115:2). To achieve a rating of "meets expectations" in this new role, Rosson required Scott to "[d]emonstrate[] appropriate progress towards completion of assignments," "[m]eet due dates," and "[c]omplete assigned tasks/products/deliverables on time and with high quality." (Doc. 37-8 at 45).

In addition to these requirements, Rosson specifically assigned Scott two 101-level presentations, one for the ISS and one for the SLS, with a due date at the end of the third quarter of 2019 (i.e., June 30, 2019). (*Id.*; doc. 37-31 at 115:12-25). Rosson sent Scott a follow-up email after the performance plan meeting to expand on his instructions for the 101-level presentations. (Doc. 37-27 at 40). In this correspondence,

Rosson declared he desired "something pretty simple and straightforward"; included a template for the presentations; and directed Scott "to focus on these two deliverables as [his] highest priority." (*Id.*). Rosson noted the presentations might "lead to something more detailed in the future, but [he was] not looking for that right now." (*Id.*). For the assigned presentations, Rosson requested "less than a dozen charts and for the information to be complementary and have a good flow." (*Id.*). Rosson and Scott then exchanged a series of emails throughout May clarifying the scope of the assigned presentations; during the exchange, Rosson cautioned Scott against "expanding the scope of [the assignment] too far beyond the original request," highlighted his desire "to avoid . . . a mis-match in expectations," and "reiterate[d] the importance of the guidelines" given. (*Id.* at 45-47).

Rosson provided feedback on drafts shortly before the June 30, 2019, deadline indicating the products "seem very complex and not extremely straightforward in their current state." (Doc. 37-27 at 70). Scott submitted two incomplete products by the deadline, and thus, he did not complete the presentations as instructed. (Doc. 37-31 at 30:7-15). Rosson extended the completion deadline to July 19, 2019, which Scott also failed to meet. (*Id.* at 30:20-24, 118:16-23). In July 2019, Rosson also assigned Scott four additional 101-level presentations for smaller customers of the HOSC. (*See* doc. 37-9 at 104; *see also* doc. 37-8 at 66).

Between July and October 2019, Rosson met with Scott every Tuesday to assess Scott's progress on the assignments. (Doc. 37-31 at 31:7-23). Throughout this period,

Rosson and Scott also exchanged several emails chronicling progress updates, feedback on submitted drafts, and concerns about Scott's repeated failures to meet deadlines established for these deliverables. (*See* doc. 37-27 at 109-11, 134, 138). In October 2019, Rosson held a midpoint review meeting with Scott, at which time Scott had not satisfactorily completed any of the six 101-level presentations. (Doc. 37-8 at 46, *see also id.* at 60; doc. 37-31 at 31:24-32:6, 121:19-22). Due to Scott's persistent failure to meet assignment deadlines for the six presentations, Rosson informed Scott "his current performance was at an unacceptable level for the Ground Data System Engineer Element." (Doc. 37-8 at 46). Consequently, on October 16, 2019, Rosson placed Scott on a 60-day PIP. (Doc. 37-31 at 32:20-33:1, 125:5-18).

In the PIP, Rosson assigned Scott two major tasks: complete the six previously assigned 101-level presentations and conduct a user experience audit of designated HOSC software applications. (Doc. 37-8 at 60; doc. 37-31 at 126:11-17). Rosson provided due dates for each subtask Scott needed to accomplish and required Scott to email him weekly progress reports on Friday afternoons. (Doc. 37-8 at 61-64). Rosson also instructed Scott "not to engage in working on this product outside the workplace" and to coordinate "[a]ll communications and meetings regarding these assignments . . . in advance with either the Branch Chief or Deputy Branch Chief before anyone else is contacted or engaged concerning feedback, support, or assistance for the completion of these tasks." (*Id.* at 64). Finally, the PIP informed Scott if his performance did not improve to an acceptable level, he "may be reassigned, reduced in grade, or removed."

(*Id.* at 60).

Regarding the first major task, Rosson set a due date of October 23, 2019, for the first three presentations and October 29, 2019, for the remaining three presentations. (*Id.* at 61). In the first bi-weekly PIP progress report, Rosson noted Scott delivered all six presentations at or shortly after the given deadlines, and Rosson considered them all on time. (*Id.* at 21). Rosson described the content of the presentations as "a little bit of a mixed bag." (Doc. 37-31 at 130:4-5). While he noted "there were some positives that came out of it," he also provided Scott written feedback stating the presentations lacked flow, contained numerous errors, and consisted of busy slides which a viewer would struggle to digest. (Doc. 37-8 at 21).

Notwithstanding Scott's mixed performance on the first task, Rosson testified "Task 2 [was] where the predominance of the PIP was related." (Doc. 37-31 at 130:6-7). Throughout the duration of the PIP, Rosson provided regular and substantial feedback about Scott's progress as Scott worked on this second, application-auditing task; at minimum, Rosson and Scott met on a bi-weekly basis, and Rosson provided frequent email communications documenting his feedback, including bi-weekly PIP progress reports. (*See* doc. 37-9 at 104; doc. 37-8 at 51 (October 18 email); *id.* at 49-50 (October 21 email); *id.* at 47 (October 22 email); *id.* at 33 (October 24 email); *id.* at 31-32 (October 25 email); *id.* at 29 (October 29 email); *id.* at 27-28 (October 30 email); *id.* at 20-24 (November 1 email); *id.* at 19 (November 4 email); *id.* at 11-14 (November 13 email); *id.* at 8-10 (November 14 email); doc. 37-9 at 220-22 (December 6 email); *id.* at

218 (December 12 email)).

　　In his communications, Rosson repeatedly highlighted his concerns with Scott's approach to the audit task and the pace at which Scott completed various subtasks. (*See* doc. 37-8 at 51 ("I have concerns that you are expanding the scope of the assessment. . . . I'll caution you about expanding the scope of or adding inefficiencies in the execution of these tasks which might derail your ability to successfully complete these assigned tasks by the required deadlines."), 31 ("After gaining a more in-depth understanding of your overall approach and methodology to collect data, I have significant concerns. . . . The concern lies in how you'll be able to take the data collected from the audit and turn that into something that could be useful to analyze, draw conclusions, and/or make recommendations from the data in an efficient and straightforward manner."), 29 ("All of the previous concerns that have been highlighted still exist. . . . The standardized data collection methodology and associated metrics approach you've shared is not straightforward and I'm not convinced that it is the most efficient way to complete the tasks."), 12 ("On numerous occasions we have tried to show you the simple and straightforward methodology to conduct this audit. . . . It's unclear why there has been such resistance to adopt something more simplistic. There were statements during this bi-weekly meeting which identified that you were moving towards this simplicity, but it did not completely resonate with me because everything which was shared regarding the spreadsheet and methodology still seemed very complex. This continuing complexity is the dominating factor as to why you are so far

behind schedule. . . . I'm very troubled by the fact that at this point in the process of conducting this task that you were supposed to have 15 applications audited. In this bi-weekly meeting, you stated that you have not conducted a complete audit on a single application and also could not articulate how the method you were using would result in actual metrics.").

In the bi-weekly PIP progress reports, Rosson reiterated these concerns about the complexity of Scott's approach and the speed at which Scott progressed through the audit. (*See id.* at 21-24 (noting concerns of scope growth, lack of clarity, and lack of standardization for data collection methods), 9-10 (highlighting late and missing deliverables and persisting concerns about data collection methodology), 16-17 (documenting outstanding deliverables and only one fully completed application audit, not the full complement of thirty then due)). For each of the three bi-weekly reviews, Rosson rated Scott's performance on the PIP as failing. (*Id.* at 24, 10, 17).

During the PIP implementation period, Scott emailed Rosson on November 8, 2019, to notify him of emerging mental health concerns. (*See id.* at 18 ("While striving mightily, efforts the last few weeks have been very frustrating, I find myself in a state close to if not entering a nervous breakdown. (This is not a metaphor.) I have consulted extensively today with [the labor union] (G. Hamilton) and [Employee Assistance Program] (T. Sterry) and asked them to see if there's a way to pause this PIP to ascertain if I'm experiencing clinical conditions and how to address them, and/or to address other issues that have hampered my ability to work."). After receiving this

26

email, Rosson called Scott to state he would do everything in his power to provide support. (Doc. 37-31 at 149:12-150:10). Rosson agreed to assist Scott regarding any requests Scott put forth for taking leave. (*Id.* at 45:18-22).

Ultimately, after taking approximately two weeks to finalize a leave request, Scott asked to take off the entire week of Thanksgiving, which Rosson granted. (*Id.* at 45:23-46:5, 151:2-8; *see also* doc. 37-8 at 5). Rosson also extended the remaining PIP deadlines by an additional week to account for this leave. (Doc. 37-31 at 46:6-11, 151:15-152:2). Outside of this leave request, Scott only requested one other change to his work hours. (Doc. 38-9 at 219). Rosson granted that request to change Scott's tour of duty. (*Id.*; doc. 37-31 at 46:12-47:6, 151:9-11).

At the end of the 60-day evaluation period, Rosson delivered a final evaluation report in which he assessed Scott's overall performance as failing. (Doc. 38-9 at 205-213). He explained his conclusions by relying primarily on Scott's poor performance on the second task of completing an application audit:

> At the end of the day, you were not successful in performing the audit task. The concerns that were previously communicated on multiple occasions appear to be a primary driver behind that inability to conduct the audit within the defined schedule. At the point in the PIP schedule when you were supposed to have all 30 applications completely audited (November 22nd), your own assessment was that you had completed only a single full audit. You estimated that you had 4 other applications which were 50% to 85% complete and an additional 3 applications which were 10% to 40% complete. At the completion of the PIP on December 20th, your self-assessment is that you had completed 2 full audits, you had 8 other applications which were 50% to 85% complete and an additional 3 which were 10% to 40% complete.

> My assessment of your work on the audit task is that there was a lot of data collected, but it's unclear how it could be used to accomplish the stated goals by Branch Management. There is no obvious way to comprehensively use the data to drive consistency amongst the applications nor make any noteworthy improvements of significance for the apps in the future. The data is not captured or presented in any way that makes it easy to understand or follow.

(Doc. 37-9 at 212). As a result of Scott's unsuccessful PIP performance, Rosson proposed Scott's removal from federal service. (*Id.* at 176-78).

Scott, with the assistance of legal counsel, provided a written response to his proposed removal on April 13, 2020. (*Id.* at 144-52). Scott and his representative also presented an oral response on May 1, 2020. (*Id.* at 164-66). Pelfrey, taking under consideration Scott's written and oral responses, rendered the final decision to remove Scott from federal service, effective May 29, 2020. (*Id.* at 159-163 ("In your responses, you have requested that I consider your reassignment to another organization. Given your significant experience in the type of work you were unsuccessful with performing during your PIP, and your long history in mission operations and your experience with these or similar applications, I have no basis to conclude you would be more successful reassigned to a different position. With respect to your demotion, based on the level and the quality of work product you provided during the PIP, I have no basis to believe you would be more successful performing at a lower grade. I have also considered that our organization does not currently have a significant amount of lower graded work which could be assigned to you, were I to demote you. After careful consideration of the options available, I have decided on your removal.").

28

On June 25, 2020, Scott, with the continued assistance of counsel, appealed his removal to the MSPB and asserted the affirmative defenses of disability and age discrimination. (Doc. 37-2; doc. 37-19 at 1). An AJ held a two-day MSPB hearing on Scott's appeal on May 6 and 7, 2021. (Doc. 37-31 at 1). During the hearing, Scott, Rosson, and Pelfrey testified. (*Id.* at 3).

The AJ issued an initial decision on July 21, 2021, affirming Scott's removal and denying his affirmative defenses. (Doc. 37-33). The AJ found NASA "satisfied its burden of proving its performance system was approved by [Office of Personnel Management (OPM)] at all relevant times." (*Id.* at 11). He held "[t]he record demonstrates that the agency had several reasons to put [Scott] on a PIP," and it "proved by substantial evidence that it notified [Scott] of specific deficiencies in his performance, and gave him an adequate opportunity to improve." (*Id.* at 11-12). The AJ also found "the agency proved by substantial evidence that its performance standards were valid" and the PIP, and various follow-up discussions, clearly explained the tasks assigned. (*Id.* at 14-15). The AJ "carefully considered the evidence" as to whether the PIP "was unreasonable and unattainable," and he found "the record supports a finding by substantial evidence that the two tasks under the PIP were reasonable and attainable within the 60-day window [Scott] was provided." (*Id.* at 15). Finally, the AJ found "Rosson's explanation for his prohibition on the appellant collaborating with colleagues on the assigned PI[P] tasks or working outside his duty shift during the PIP . . . to be credible and closely tied to the legitimate purposes of the

29

PIP . . . ." (*Id.* at 17-18). The AJ thus concluded "the agency satisfied its burden of proving the charge of unsuccessful performance by substantial evidence." (*Id.* at 18).

As to Scott's affirmative defense alleging disability discrimination, the AJ held Scott "did not establish by a preponderance of the evidence that his anxiety rose to the level of a disability, or that he had a record of a disability, or was perceived as disabled within the meaning of 42 U.S.C. § 12102(1), 29 C.F.R. § 1630.2(g)(1), (2), (3)." (*Id.* at 20). The AJ also denied Scott's affirmative defense of age discrimination, holding Scott failed to provide evidence to support a causal connection between his age and his removal. (*Id.* at 21).

On August 25, 2021, Scott petitioned the MSPB for review of the AJ's initial decision. (Doc. 37-35). The MSPB denied Scott's petition for review and affirmed the AJ's initial decision in a Final Order issued April 26, 2023, finding Scott had "not established any basis under [5 C.F.R. § 1201.115] for granting the petition for review." (Doc. 37-39 at 2). The Board noted Scott did not raise his argument of "'inherent bias' in the agency's process" before the AJ, but it concluded that if it "were to consider this argument, [it] would find that it is without merit." (*Id.* at 2-3).

Scott then filed a Petition for Review with the Equal Employment Opportunity Commission Office of Federal Operations (EEOC OFO) on May 25, 2023. (Doc. 37-41). The EEOC OFO issued a decision on July 10, 2023, concurring with the MSPB's Final Order. (*See* doc. 37-44 at 4) (Even "assum[ing] arguendo [Scott] was an individual with a disability, who was qualified for the position that he held, and that management

was aware of his disability and need for accommodation . . . he [still] failed to persuasively show that the Agency violated the Rehabilitation Act."); (*id.*) ("[A]ssuming arguendo that [Scott] established a prima facie case of discrimination, we find that Agency management articulated legitimate, non-discriminatory reasons or its actions. More specifically, the removal was based solely on [Scott]'s failure to successfully complete the PIP."). Therefore, "[t]he Commission [found] that the MSPB's decision constitutes a correct interpretation of the laws, rules, regulations, and policies governing this matter and is supported by the evidence in the record as a whole." (*Id.*).

Subsequent to the EEOC OFO's decision, Scott filed this *pro se* action on August 8, 2023. (Doc. 1). On July 30, 2024, Scott filed an amended complaint alleging unlawful employment actions by the Agency. (Doc. 30). In particular, Scott alleged disability discrimination "because of the episodic anxiety/depression induced by NASA's behavior" (Count I) as well as age discrimination (Count II). *Id.* at 9-10. Scott also petitioned the court for judicial review of the MSPB Opinion and Order (Count III). *Id.* at 10.

On April 11, 2025, Nelson moved for judgment on the administrative record regarding the court's review of the MSPB decision, (doc. 38), and summary judgment on Scott's disability and age discrimination claims, (doc. 39).

## THE COURT GRANTS THE AGENCY'S
## MOTION FOR SUMMARY JUDGMENT

The Agency requests the court grant summary judgment in its favor on Scott's disability and age discrimination claims.[7]  In response to the motion, Scott declared as follows: "While I believe there are legitimate concerns on the topics involved, particularly with regards to the medical issue – the Agency could have been much more proactive, and should have realized that their actions caused my situation.  In the interest of simplifying things, I move to dismiss both discrimination claims."  (Doc. 44 at 12).

Scott cannot move to dismiss the discrimination claims at this stage of the litigation.  A plaintiff may dismiss an action without court order "by filing (i) a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment; or (ii) a stipulation of dismissal signed by all parties who have appeared." Fed. R. Civ. P. 41(a)(1)(A).  The Agency has filed a motion for summary judgment, so Scott cannot dismiss this action without a stipulation of the parties or a "court order, on terms that the court considers proper."  Fed. R. Civ. P. 41(a)(2).  Furthermore, "Federal Rule of Civil Procedure 41(a)(2) provides only for the dismissal of *an entire action*.  Any attempt to use this rule to dismiss a single claim, or anything less than the entire action, will be invalid."  *Rosell v. VMSB, LLC*, 67 F.4th 1141, 1143 (11th Cir. 2023)

---

[7] Although the Agency declares it seeks a dismissal of all claims lodged in the Amended Complaint (doc. 39 at 30), it only discusses the discrimination claims in its Motion for Summary Judgment. Therefore, the summary judgment adjudication appertains solely to the discrimination claims.

(emphasis added).  Therefore, Scott improperly moves to dismiss his age and disability discrimination claims.

As an initial matter, courts must adjudicate summary judgment motions on the merits, even in the event a non-movant fails to respond to a motion.  *See Embry v. Carrington Mortg. Servs., LLC*, No. 24-13352, 2025 WL 3101715, at *3 (11th Cir. Nov. 6, 2025) ("We have held that 'the district court cannot grant a motion for summary judgment merely for lack of any response by the opposing party, since the district court must review the motion and supporting papers to determine whether they establish the absence of a genuine issue of material fact.'"  (quoting *Trs. of Cent. Pension Fund of Int'l Union of Operating Eng'rs & Participating Emps. v. Wolf Crane Serv., Inc.*, 374 F.3d 1035, 1039 (11th Cir. 2004))); *see also United States v. 5800 SW 74th Ave.*, 363 F.3d 1099, 1101 (11th Cir. 2004) ("[T]he district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion").

Nevertheless, when a non-movant responds to a summary judgment motion's challenge to particular claims, the litigant's failure to respond to a movant's arguments regarding other asserted claims constitutes an abandonment of those other claims.  *See Edmondson v. Bd. of Trs. of Univ. of Alabama*, 258 F. App'x 250, 253 (11th Cir. 2007) ("In opposing a motion for summary judgment, a party may not rely on her pleadings to avoid judgment against her.  There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary

judgment.  Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." (citing *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995))); *B & D Nutritional Ingredients, Inc. v. Unique Bio Ingredients, LLC*, 758 F. App'x 785, 790 (11th Cir. 2018) (holding the non-movant abandoned a ground vaguely alleged in the complaint and not raised when responding in opposition to summary judgment); *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (deeming an issue first raised in the non-movant's supplemental reply brief abandoned); *McIntyre v. Eckerd Corp.*, 251 F. App'x 621, 626 (11th Cir. 2007) ("In McIntrye's response to Eckerd's motion, however, she offered no argument regarding her battery claim.  Thus, the district court did not err in concluding that because McIntrye made no argument on this claim, she abandoned it."); *Adams v. Bank of Am., N.A.*, 237 F. Supp. 3d 1189, 1203 (N.D. Ala. 2017) ("A party that fails to defend a claim that is targeted by a summary judgment motion is deemed to have abandoned that claim."); *HNS Partners, LLC v. Brew Theory, LLC*, No. 2:22-cv-1203-AMM, 2024 WL 6847435, at *6 (N.D. Ala. Sept. 27, 2024) ("[W]here the non-moving party fails to address a particular claim asserted in the summary judgment motion but has responded to other claims made by the movant, the district court may properly consider the non-movant's default as intentional and therefore consider the claim abandoned." (alteration in original) (quoting *Powell v. Am. Remediation & Env't, Inc.*, 61 F. Supp. 3d 1244, 1252 n.9 (S.D. Ala. 2014), *aff'd,* 618 F. App'x 974 (11th Cir. 2015))).

34

A district court decision aptly delineates the contours of the two approaches to a non-movant's failure to address summary judgment arguments challenging particular claims:

> Where a party wholly fails to respond to a summary judgment motion, the district court must make sure that it nonetheless is appropriate to enter summary judgment against the party that did not respond. Where, however, the non-movant fails to address a particular claim asserted in the summary judgment motion, but has responded to other claims made by the movant, the district court may properly consider the non-movant's default as intentional, and therefore consider the claim abandoned.

*Rossi v. Fulton County*, No. 1:10-CV-4254-RWS-AJB, 2013 WL 1213205, at *21 n. 10 (N.D. Ga. Feb. 8, 2013), *report and recommendation adopted sub nom. Rossi v. Fulton Cnty. Bd. of Assessors/Fulton Cnty. Tax Assessors Off.*, No. 1:10-CV-4254-RWS, 2013 WL 1213139 (N.D. Ga. Mar. 22, 2013); *see also Powell*, 61 F. Supp. 3d at 1252 n.9.

The court construes Scott's attempt to dismiss his age and disability discrimination claims as abandonment of those claims. *See Baxter v. Santiago-Miranda*, 121 F.4th 873, 884-86 (11th Cir. 2024) (construing plaintiffs' response stating, "Plaintiffs dismiss their claims," and "Plaintiffs have decided not to pursue their claim," as "tantamount to abandonment of that claim").[8] Therefore, the court **GRANTS**

---

[8] Furthermore, although Scott abandoned his discrimination claims on appeal to this court, the court notes the AJ denied Scott's affirmative defenses of disability discrimination and age discrimination. (Doc. 37-33 at 20-21). The AJ did not abuse his discretion in reaching this conclusion.

To prevail on his Age Discrimination in Employment Act of 1967 (ADEA) defense, Scott must establish he represents an individual over 40 years old who suffered an adverse personnel action tainted by "consideration of age." *Babb v. Wilkie*, 589 U.S. 399, 402 (2020). The AJ noted "the first two elements for an ADEA claim are clearly met since [Scott] was more than 40 years old at the time he was placed on a PIP and removed, [yet Scott] presented no evidence concerning the third

element—namely, that there was a causal connection between his age and removal." (Doc. 37-33 at 20). Upon review, this court does not discern any evidence in the record before the AJ to contradict that determination. On appeal of the AJ's decision to the full Board, Scott contended for the first time that in the prior five-year period "eight employee[s had] been forced out of the Agency through formal or informal processes, who are all over forty (40) years old." (Doc. 37-35 at 13). He did not, however, provide any evidence to support this assertion. This unsupported claim, advanced for the first time on appeal of the AJ's decision, does not constitute sufficient evidence to hold the AJ, or the MSPB, acted arbitrarily or capriciously. *See Kency v. MSPB*, No. 2024-1068, 2024 WL 1406569, at *2 (Fed. Cir. Apr. 2, 2024), *cert. denied,* 145 S. Ct. 378 (2024).

The MSPB also acted within its discretion in denying Scott's disability discrimination defense. A petitioner can claim disability discrimination under the Rehabilitation Act through three theories: reasonable accommodation, disparate treatment/hostile work environment, and disparate impact. *See Schwarz v. City of Treasure Island*, 544 F.3d 1201 (11th Cir. 2008). Scott did not assert a disparate impact claim in the AJ hearing, so the AJ considered Scott's claim under the theories of reasonable accommodation and disparate treatment. (Doc. 37-33 at 19). The AJ held Scott "did not establish by a preponderance of the evidence that his anxiety rose to the level of a disability, or that he had a record of a disability, or was perceived as disabled within the meaning of 42 U.S.C. § 12102(1), 29 C.F.R. § 1630.2(g)(1), (2), (3)." (*Id.* at 20).

Even assuming, *arguendo*, the AJ improperly held Scott did not prove a disability as required for a Rehabilitation Act claim, Scott could not sustain a disability discrimination claim. (Doc. 37-44 at 3-4). The record reflects Scott first informed Rosson of his anxiety and impending nervous breakdown during the PIP. (Doc. 37-31 at 44:20-45:6; *id.* at 148:11-149:11; doc. 37-8 at 18). Notably, in his filings related to the current appeal, Scott has affirmed this timeline, as he repeatedly asserts the PIP caused his anxiety. (Doc. 30 at ¶ 24; doc. 44 at 9-10, 11). In addition, the record reflects Rosson granted every accommodation Scott requested after informing Rosson of his emerging mental health challenges, including requested leave during Thanksgiving week, an extension of the PIP schedule to accommodate the leave granted, and a change in tour of duty to work different hours each day. (Doc. 37-9 at 106, 218; doc. 37-8 at 5-6, 11; doc. 37-31 at 45:13-47:6; 149:12-152:2). Therefore, Scott cannot succeed on a reasonable accommodation theory. *Cf. Frazier-White v. Gee*, 818 F.3d 1249, 1255-56 (11th Cir. 2016) ("[A]n employer's 'duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation is made.'" (quoting *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999))).

Finally, Scott's claim would also fail under a disparate treatment theory. Under the *McDonnell Douglas* burden-shifting framework, if Scott could make out a *prima facie* case of disparate treatment, he must then show any legitimate reasons for removal offered by NASA constituted a pretext for discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The record reflects "[a]gency management articulated legitimate, non-discriminatory reasons for its actions. More specifically, the removal was based solely on [Scott's] failure to successfully complete the PIP." (Doc. 37-44 at 4). Scott offered no evidence in the record that NASA asserted this reason as pretext for his removal; therefore, his claim must fail. Accordingly, this court finds no reason to overturn the AJ's denial of age and disability discrimination as affirmative defenses for Scott's removal, as this denial does not constitute an arbitrary or capricious decision.

36

summary judgment to Nelson on the age discrimination and disability discrimination claims.[9]

## THE COURT GRANTS THE AGENCY'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

As for the remaining claim at bar, Scott petitions for judicial review of the MSPB's decision affirming NASA's discharge.[10] "Again, for the court to rule in [Scott's]

---

[9] Despite dismissing the discrimination claims, this court retains continued jurisdiction to review the MSPB decision. *Cf. Murphy v. McCarthy*, No. 5:14-cv-02489-RDP, 2017 WL 6492607 (N.D. Ala. Dec. 19, 2017), *aff'd sub nom. Murphy v. Sec'y, U.S. Dep't of Army*, 769 F. App'x 779 (11th Cir. 2019) (reviewing MSPB decision after previously dismissing the plaintiff's discrimination claims). While the general rule requires petitioners to file for judicial review of MSPB decisions in the Court of Appeals for the Federal Circuit, see 5 U.S.C. § 7703(b)(1)(A), federal district courts properly exercise jurisdiction over mixed cases involving claims of discrimination. *See Perry v. MSPB*, 582 U.S. 420, 425-26 (2017) (citing *Kloeckner v. Solis*, 568 U.S. 41 (2012)); *see also id.* at 432 ("Judicial review of such a [mixed] case lies in district court."); *Kloeckner*, 568 U.S. at 50 ("[M]ixed cases shall be filed in district court."). The Federal Circuit could not exercise jurisdiction over this case as Scott filed it, and this court cannot transfer this case to the Federal Circuit as the statutory authorization to transfer venue only allows for transfer "to any other district or division where [the action] might have been brought." 28 U.S.C. § 1404(a); *cf. Del Monte Fresh Produce Co. v. Dole Food Co.*, 136 F. Supp. 2d 1271, 1281 (S.D. Fla. 2001) ("[T]he plaintiff must have had the right to bring the action in the district where the movant seeks to have the case transferred at the time the complaint was filed. (citing *Hoffman v. Blaski*, 363 U.S. 335, 344 (1960); *Harris v. Garner*, 216 F.3d 970, 973 (11th Cir. 2000))).

[10] The court reviews the AJ's Initial Decision and the MSPB's Final Order denying Scott's petition for review of the initial decision. The statute permitting judicial review provides "[a]ny employee or applicant for employment adversely affected or aggrieved by a *final order or decision* of the Merit Systems Protection Board may obtain judicial review of the order or decision." 5 U.S.C. § 7703(a)(1) (emphasis added). In denying Scott's petition for review of the AJ's initial decision, the MSPB affirmed the initial decision, "which is now the Board's final decision." (Doc. 37-39 at 3 (citing 5 C.F.R. § 1201.113(b)). Scott petitioned this court for judicial review of the opinion and order of MSPB. (*See* doc. 30 at 10). Therefore, the court reviews both the initial decision, made final by the MSPB's order, and the MSPB's order itself. *See, e.g., Abou-Hussein v. Dep't of Navy*, 640 F. App'x 897 (Fed. Cir. 2016) (reviewing the AJ's "Initial Decision (which became the MSPB's final decision)" and the MSPB's decision to affirm the AJ's decision).

The court does not, however, review the EEOC OFO's decision on the administrative record. The EEOC OFO retains the authority to review decisions of the MSPB in "mixed cases" only as to a claimant's discrimination claims. *See* 5 U.S.C. § 7702(b)(3)(B); (doc. 37-39 at 6 ("Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of your discrimination claims only, excluding all other issues. (citing 5 U.S.C. § 7702(b)(1)))). A court subjects such discrimination claims to trial *de novo*, not review of the administrative record. *Cf. Payne v. Salazar*,

favor, [Scott] must show that the MSPB's decision was (1) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." *Harris*, 2024 WL 4031357, at *4 (citing 5 U.S.C. § 7703(c)). The court reviews the MSPB's decision on the administrative record. *Kelliher*, 313 F.3d at 1275.

### A.    The MSPB's Decision Does Not Exhibit Clear Error or an Abuse of Discretion.

Scott asserts the AJ abused his discretion in reaching his decision to affirm NASA's removal decision. (*See* doc. 44 at 7; doc. 48 at 2; doc. 49 at 5-6). "In determining whether the outcome in an adjudication before an administrative agency such as the MSPB is arbitrary and capricious we . . . only seek to ensure that the decision was reasonable and rational." *Kelliher*, 313 F.3d at 1276. "[T]he court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park*, 401 U.S. at 416; *see also Kelliher*, 313 F.3d at 1276 (citing *N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1538 (11th Cir. 1990)). "Along the standard of review continuum, the arbitrary and capricious standard gives an appellate court the least latitude in finding grounds for reversal." *Baker*, 452 F.

---

619 F.3d 56, 62 (D.C. Cir. 2010) ("In short, what the Court meant by "trial de novo" was the traditional federal trial of a civil action–in contrast to the limited, deferential review of agency decisionmaking afforded, for example, under the Administrative Procedure Act." (citing *Chandler v. Roudebush*, 425 U.S. 840 (1976))).

App'x at 937 (quoting *N. Buckhead Civic Ass'n*, 903 F.2d at 1538); *see also Overton Park*, 401 U.S. at 416 ("Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.").

Pursuant to the foregoing standard, the AJ did not abuse his discretion in upholding Scott's discharge. The AJ "articulated reasons for [his] fact finding decisions in [his] written opinion and applied those facts to the legal standards governing" Scott's claims. *Kelliher*, 313 F.3d at 1276; *see also Murphy*, 2017 WL 6492607, at *3. As an initial matter, the AJ found the agency, NASA, demonstrated "OPM[] approved the agency's performance appraisal system," by providing "a copy of two [of] OPM's approval memos for NASA's performance appraisal system dated January 31, 2005, and October 8, 2019." (Doc. 37-33 at 2, 11). The AJ also concluded the agency met its burden under *Santos v. NASA*, 990 F.3d 1355, 1360 (Fed. Cir. 2021), to demonstrate "the imposition of the PIP was justified" as Scott received a failing annual performance rating for the 2018-2019 period, followed by a failing midpoint evaluation "for the same basic well-documented problem of missing project deadlines." (Doc. 37-33 at 2, 11-12 ("I find that the agency proved by substantial evidence that the appellant's performance for at least one critical element was unsuccessful at the time when the PIP was implemented.")).

In addition, the AJ found NASA met its burden to sustain Scott's discharge by applying fact-finding decisions to the governing legal standards. (*See id.* at 2 ("[T]he

Case 5:23-cv-01041-HNJ    Document 52    Filed 03/11/26    Page 40 of 50

agency bears the burden of proving the following by substantial evidence: (1) [t]he appellant's performance failed to meet the established performance standards in one or more critical elements of his position; (2) the agency established performance standards and critical elements and communicated them to the appellant at the beginning of the performance appraisal period; (3) the agency warned the appellant of the inadequacies of his performance during the appraisal period and gave him an adequate opportunity to improve; (4) the appellant's performance standards met the statutory requirements of 5 U.S.C. § 4302(b)(1) and did not constitute an abuse of discretion; and (5) after an adequate improvement period, the appellant's performance remained unacceptable in at least one critical element." (citing 5 U.S.C. §§ 4302, 7701(c)(1)(A); *Lee v. EPA*, 115 M.S.P.R. 533, ¶ 5 (2010))); *id.* at 18 ("I find that the agency satisfied its burden of proving the charge of unsuccessful performance by substantial evidence.")).

The AJ found NASA established each of the five required elements with substantial evidence. (*Id.* at 12-17). Specifically, the AJ noted "at least twelve emails from Rosson to [Scott] during the PIP . . . in which Rosson repeatedly detailed performance concerns primarily related to [Scott]'s slow progress on the application task" assigned in the PIP. (*Id.* at 12). The AJ deemed the performance standards valid; he held Scott "was certainly informed within his Performance Plan of the importance of completing his assigned tasks on time and with high quality"; and determined "the parameters of [the main task] were clearly explained within the PIP and in numerous follow-up counseling discussions." (*Id.* at 14).

The AJ additionally concluded "the record supports a finding by substantial evidence that the two tasks under the PIP were reasonable and attainable within the 60-day window [Scott] was provided." (*Id.* at 15). In reaching this conclusion, the AJ noted the first task, consisting of six 101-level presentations, called for short presentations providing basic introductory content, with each presentation consisting of less than twelve slides, and Scott "had already been working nearly full-time on these same basic presentations for several months," so he only needed to finalize them during the PIP period. (*Id.* at 15-16). Furthermore, the AJ held "the fairly simple nature" of the second task, auditing the user experience for thirty commonly used NASA applications, "was well supported by the record, and is deemed proven by at least substantial evidence." (*Id.* at 17). The AJ found Scott insisted on complicating the second task by gathering far more data points than required, resulting in Scott completing only two of the thirty assigned application audits. (*Id.*; *see also id.* at 15 ("[Scott] just thought he had a better plan for completing the task, and unfortunately, it strongly appears that he was wrong.")).

Furthermore, the AJ properly adjudged Scott's contention the PIP improperly restricted his ability to collaborate with others on the assigned tasks. During the AJ hearing, "Rosson testified that he did not design the PIP to cause [Scott] to fail, but instead designed it to gauge [Scott's] individual performance and productivity within firm but reasonable time constraints." (*Id.* at 17). The AJ found Rosson's explanation for the collaboration restrictions "to be credible and closely tied to the legitimate

purposes of the PIP, which is fundamentally a tool to assess an employee's individual duty performance, often while working under some time pressure." (*Id.* at 17-18).

"No reason exists to disturb [the AJ's] credibility finding, which is 'virtually unreviewable on appeal.'" *Biswas v. Dep't of Veterans Affs.*, 127 F.4th 332, 340 (Fed. Cir. 2025) (quoting *Bieber v. Dep't of Army*, 287 F.3d 1358, 1364 (Fed. Cir. 2002)). In addition, while the duties and responsibilities of a GS-13 engineer may include significant levels of collaboration, the position description does not require collaboration in *all* aspects of the job. (*See* doc. 37-8 at 94-97). The AJ reasonably determined the PIP legitimately restricted collaboration to assess Scott's individual performance on the assigned tasks, both of which reasonably related to Scott's position. (*See id.* at 95 (stating major duties of a GS-13 Computer Engineer include "[e]valuat[ing] new systems engineering technologies and investigat[ing] advances in operating systems, network architectures, software applications and computer system hardware to determine applicability for use in assigned data acquisition systems, high performance computing systems, and network development[; p]repar[ing] and present[ing] technical reports covering detailed facets and ramifications of program technical efforts[; and p]erform[ing] analytical studies of IT systems and initiat[ing] system analysis of trade studies to determine optimal solutions for accomplishments of program objectives"); doc. 37-33 at 14 ("[T]he Board will defer to managerial discretion in determining what agency employees must do in order to perform acceptably in their positions." (citing *Jackson v. Dep't of Veterans Affs.*, 97 M.S.P.R. 13, ¶ 14 (2004)))).

42

Scott also contends the AJ abused his discretion by not finding Agency bias vis-à-vis HR's suggestion that Rosson should subject Scott to a disciplinary action rather than a PIP, (doc. 44 at 7).  In the proceedings administered by the AJ, Scott, represented by counsel, failed to raise any argument concerning the alleged bias of NASA decision-makers; rather, he first raised this argument in his petition for review of the AJ's decision.  (*See* doc. 37-39 at 2; doc. 37-35 at 15-16; doc. 37-38 at 10-13).

The doctrine of issue exhaustion requires, often through statutes or regulations, "courts reviewing agency action [to] regularly ensure against the bypassing of that requirement by refusing to consider unexhausted issues."  *Sims v. Apfel*, 530 U.S. 103, 108 (2000); *see also Mahon v. U.S. Dep't of Agric.*, 485 F.3d 1247, 1254-55 (11th Cir. 2007) ("Under ordinary principles of administrative law, a reviewing court will not consider arguments that a party failed to raise in timely fashion before an administrative agency." (quoting *Sims*, 530 U.S. at 114)); *Vidiksis v. EPA*, 612 F.3d 1150, 1158 (11th Cir. 2010) ("[C]ourts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practices." (alteration in original) (quoting *L. A. Tucker Truck Lines, Inc.*, 344 U.S. at 37)).

As the Eleventh Circuit has recognized, applying the doctrine of issue exhaustion advances a variety of policy goals imbedded in judicial review of administrative agency decisions:

1) avoid[ing] premature interruption of the administrative process; (2)

> let[ting] the agency develop the necessary factual background upon which decisions should be based; (3) permit[ting] the agency to exercise its discretion or apply its expertise; (4) improv[ing] the efficiency of the administrative process; (5) conserv[ing] scarce judicial resources, since the complaining party may be successful in vindicating rights in the administrative process and the courts may never have to intervene; (6) giv[ing] the agency a chance to discover and correct its own errors; and (7) avoid[ing] the possibility that frequent and deliberate flouting of the administrative processes could weaken the effectiveness of an agency by encouraging people to ignore its procedures.

*Mahon*, 485 F.3d at 1255 (quoting *Johnson v. Meadows*, 418 F.3d 1152, 1156 (11th Cir. 2005) (cleaned up)).

"[T]he MSPB has promulgated regulations requiring issue exhaustion." *Crowe v. Wormuth*, 74 F.4th 1011, 1034 (9th Cir. 2023) (citing 5 C.F.R. § 1201.59(c)). "Based on these regulations, the MSPB requires a claimant to exhaust an issue before an AJ before the full Board's review panel will consider it." *Id.* (citing *McClenning v. Dep't of the Army*, No. SF-0752-15-0702-I-6, 2022 WL 985905, at *3-6 (M.S.P.B. Mar. 31, 2022)).

> A party in an MSPB proceeding must raise an issue before the administrative judge if the issue is to be preserved for review in [federal] court. Thus if a party fails to raise an issue in the administrative proceeding or raises an issue for the first time in a petition for review by the full Board, this court will not consider the issue.

*Bosley v. MSPB*, 162 F.3d 665, 668 (Fed. Cir. 1998); *see also Lockhart v. Dep't of Def.*, No. 24-11177, 2025 WL 1100859, at *3 n.1 (11th Cir. Apr. 14, 2025) ("Because Lockhart failed to meaningfully raise his arguments . . . before the [AJ], those arguments are not properly before this Court." (citing *Bosley*, 162 F.3d at 668)).

The AJ did not abuse his discretion in failing to find the NASA decisionmakers

44

exhibited bias, as Scott did not raise this issue in the AJ proceedings.  (*See* doc. 37-39 at 2).[11]  Scott did not explain why he failed to raise his argument of inherent bias in the AJ hearing.  In his petition to the Board for review of the AJ's decision, Scott did not argue he had obtained new evidence, unavailable before the initial hearing record closed, to support his argument regarding biased decision making.[12]  Therefore, the Board did not abuse its discretion in declining to consider this argument when raised in Scott's petition for review, as Scott did not properly exhaust this issue.  *See Kency v. MSPB*, No. 2024-1068, 2024 WL 1406569, at *2 (Fed. Cir. Apr. 2, 2024), *cert. denied,* 145 S. Ct. 378 (2024) (holding "the Board did not abuse its discretion in refusing to consider [the plaintiff's] new arguments" when the plaintiff did not provide any explanation for not raising those arguments to the AJ); 5 C.F.R. § 1201.59(c) ("Once the record closes, additional evidence or argument will ordinarily not be accepted unless: (1) the party submitting it shows that the evidence or argument was not readily available before the record closed . . . .").

Moreover, the court declines to consider this argument now in the first instance. *See Kency*, 2024 WL 1406569, at *2 (citing *Elmore v. Dep't of Transp.*, 421 F.3d 1339, 1342 (Fed. Cir. 2005) ("Where, as here, the Board denied review of the administrative judge's initial decision, this court will not consider issues not raised before the administrative

---

[11] Scott first referenced HR's advice to Rosson, "Don't put Scotty on a PIP because he'll do well," in his Reply to Agency's Response to Appellant's Petition for Review.  (*See* doc. 37-38 at 12-13).
[12] To the extent Scott now argues he has discovered new evidence to support this position, the court rejected that argument, *supra*.

judge."); *Linn v. OPM*, 566 F. App'x 962, 964 (Fed. Cir. 2014) ("As the Board noted in its decision, [the petitioner] had the opportunity to raise this argument in his initial appeal to the [AJ] . . . and failed to do so. A litigant who fails to properly raise an issue before an administrative agency ordinarily is precluded from litigating that issue before us." (alterations in original)))[13].

Accordingly, "[t]he court finds that there is no clear error in the [AJ]'s judgment in approving [Scott]'s discharge." *Murphy*, 2017 WL 6492607, at *4.

**B.    The MSPB Obtained Its Decision with Procedures Required by Law, Rule, or Regulation.**

Although Scott alleges "numerous procedural errors and questionable ethical actions," (doc. 49 at 4), he attributes all of these alleged violations to various NASA decision makers between May 2018 and May 2020, before the MSPB hearing occurred. (*See, e.g.*, doc. 44 at 7 ("This motivation and deliberate [sic] and/or carelessness by [NASA] led to actions, inactions, omissions, and procedural violations by one or more of those parties acting independently and/or in concert, that, especially when viewed as a whole, resulted in intolerable unfairness, procedural harm, and violation of Merit Systems Principles.")).

In *Murphy v. McCarthy*, the eponymous plaintiff asserted a similar argument,

---

[13] Despite declining to consider the argument of "inherent bias" in NASA's performance review, PIP, and termination processes on petition for review of the AJ's initial decision, the Board stated, "Nevertheless, even if we were to consider this argument, we would find that it is without merit." (Doc. 37-39 at 3). The court finds no evidence this constitutes a clear error of judgment, as required to overturn this finding under the arbitrary and capricious standard of review.

contending, *inter alia*, "the [AJ]'s decision was not obtained with procedures required by law, rule, or regulation because . . . the Agency did not follow its own procedures when it decided to remove Murphy because she was entitled to a reasonable accommodation under the Agency's Standard Operating Procedure . . . ." *Murphy*, 2017 WL 6492607, at *5. Like Murphy, Scott "does not assert that []he did not receive a fair hearing or that the MSPB violated the appellate procedures laid out in 5 U.S.C. § 7701." *Id.*

The *Murphy* court reviewed the record and concluded the "the MSPB followed proper rules and procedures while evaluating Plaintiff's appeal of her removal." *Id.* (citing *Musgrove v. Vilsack*, 173 F. Supp. 3d 1337, 1349 (M.D. Ga. 2016)). In reaching this conclusion, the court noted "Plaintiff received a full and fair hearing under the applicable MSPB procedures, was represented by counsel throughout the appellate process, submitted evidence on her own behalf, and testified on her own behalf." *Id.*

The same analysis applies to Scott, as Scott benefited from representation of counsel during the administrative proceedings before the AJ and the MSPB. Scott also testified at the initial hearing and submitted evidence on his behalf throughout the process. Therefore, "the court finds no basis for disturbing the MSPB's decision based on this matter." *Id.*; *see also Keel v. U.S. Dep't of Air Force*, 256 F. Supp. 2d 1269, 1283 (M.D. Ala. 2003), *aff'd,* 99 F. App'x 880 (11th Cir. 2004) ("Plaintiff received a full and fair hearing under the applicable procedures of the MSPB. He was represented by counsel of his choosing, testified on his own behalf, called witnesses, submitted evidence, and his counsel had broad latitude in cross-examining witnesses. The AJ

rendered a written decision, which Plaintiff had an opportunity to challenge by a petition for review by the full MSPB. Plaintiff was allowed to present new evidence and to attempt to show the AJ's decision was based on an erroneous interpretation of a statute or regulation. Accordingly, this court concludes that there is no basis for disturbing the decision of the MSPB based on the procedures by which the decision was obtained.").

**C.    The MSPB Supported Its Decision with Substantial Evidence.**

In *Kelliher*, the Eleventh Circuit delineated the applicable standard for determining if substantial evidence supports a decision:

> When reviewing administrative decisions to determine if they are supported by substantial evidence this court examines the entire record but defers to the agency's factual determinations as long as there is relevant evidence that supports the finding as reasonable. *Fort Valley State Coll. v. Bennett*, 853 F.2d 862, 863 (11th Cir. 1988); *City of Pompano Beach v. FAA*, 774 F.2d 1529, 1539-40 (11th Cir. 1985). This deferential standard of review means that as long as the conclusion is reasonable, we defer to the agency's findings of fact even if we could have justifiably found differently. *Fort Valley State Coll.*, 853 F.2d at 864, 866; *City of Pompano Beach*, 774 F.2d at 1540. We do not re-weigh or re-examine the credibility choices made by the fact finder. *Fort Valley State Coll.*, 853 F.2d at 866.

*Kelliher*, 313 F.3d at 1277; *see also Boylan v. U.S. Postal Serv.*, 704 F.2d 573, 575 (11th Cir. 1983) ("[A] court will not overturn an agency decision if it is supported by 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' . . . The question is not what the court would believe on a de novo appraisal, but whether the administrative determination is supported by substantial evidence on the record as a whole." (quoting *Brewer v. U.S. Postal Serv.*, 647 F.2d 1093, 1096 (Ct. Cl. 1981))).

48

Substantial evidence supported the AJ's decision to uphold Scott's removal. The initial hearing spanned two days, during which the AJ heard testimony from Scott, Rosson, and Pelfrey. (*See* doc. 37-31). The AJ also reviewed hundreds of pages of records received into evidence. He cited to many of these documents throughout his decision, including numerous emails between Scott and Rosson, Performance Plans from 2018-2019 and 2019-2020, the PIP document, and various bi-weekly assessments throughout the PIP period. (*See* doc. 37-33). Therefore, the court concludes the "[t]estimony and the evidence contained in the administrative record support the [AJ]'s determinations." *Murphy*, 2017 WL 6492607, at *5; *see also id.* (holding an eight-hour hearing and records received into evidence constituted substantial evidence to support the AJ's decision).

"Because the court finds that the decision of the MSPB was not arbitrary or capricious, was not made without regard to the law, and was based on substantial evidence, the court concludes that the final decision of the MSPB is due to be affirmed." *Id.* Therefore, the court **GRANTS** Nelson's Motion for Judgment on the Administrative Record.

## CONCLUSION

For the foregoing reasons, the court **DENIES** Scott's Motion to Expand the Administrative Record, (doc. 48). The court **GRANTS** Nelson's Motions for Summary Judgment, (doc. 39), and Judgment on the Administrative Record, (doc.38).

**DONE** and **ORDERED** this 11th day of March, 2026.

HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE